**United States District Court**
For the Northern District of California

1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                 FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11   WALKER & ZANGER, INC,                     No   C-04-1946 VRW

12          Plaintiff,                              AMENDED ORDER

13          v

14   PARAGON INDUSTRIES, INC,

15          Defendant.
     _____/
16

17          [The order, previously entered on December 1, 2006, is

18   amended to correct a misquotation of 17 USC § 410(c) derived from

19   misleading Ninth Circuit case law.  See infra at 26-27.  There are

20   no other changes in the order.]

21          Walker & Zanger, Inc filed this action May 18, 2004,

22   against Paragon Industries, Inc, alleging a variety of claims under

23   the Lanham Act, the Copyright Act, state unfair competition law and

24   state false advertising law.  Compl (Doc #1).

25          Defendant moves for summary judgment on plaintiff's

26   claims and moves to strike surveys performed by plaintiff's expert

27   Dr Henry Ostberg.  Doc ##82, 87.  Plaintiff moves to exclude

28   testimony of defendant's expert Travis Culwell.  Doc #107.  For

**United States District Court**

For the Northern District of California

reasons discussed below, the court GRANTS IN PART and DENIES IN
PART defendant's motion for summary judgment, DENIES defendant's
motion to strike and DENIES plaintiff's motion to exclude
testimony.

I

Plaintiff is a producer of high quality stone and ceramic
decorative tiles and tile collections for use in a variety of
settings.  Doc #111, Ex B at 12:16-25, 13:1-15 (Overend decl).
Plaintiff's tiles are nationally marketed in several series, or
lines, each of which is devoted to a particular artistic concept,
such as a line exemplifying a French provençal theme.  Overend
decl, Ex G.  The tile lines at issue in this case are the Avignon
and Newport lines, which were first promoted in approximately
August 1999.  Overend decl, Ex B.

According to plaintiff, the trade dress for the tiles is
consistent with the design theme, and, taken as a whole, the design
elements of the tiles and their trade dress "create an inherently
distinctive and non-functional trade dress which readily identifies
[plaintiff's] products as being associated with [plaintiff]."  Id.
The distinctive features of plaintiff's tiles are said to include
classical design, colors and glazes that evoke the look of "Old
World handiwork."  Id at Ex D; Id at Ex H, at 29:18-25, 47:19-
49:25, 55:14-56:2.  Other distinguishing characteristics include
the depth and dimensions of design relief and the level of
intricate detailings.  Id at Ex E, no 15; Id at Ex G, at 76:21-
77:2, 79:3-80:2.  Plaintiff's Avignon line, its best selling tile
collection, uses a combination of designs, glazes, textures and
colors to create a French provençal theme.  Id, Ex G at 18:7-25,

**United States District Court**
For the Northern District of California

19:12-19, 21:2-23:8.   The collection is intended to capture a variety of French-inspired designs, specifically invoking the "look and feel" of French architecture and art "over a large span of time.  Id, Ex G at 18:7-18.

Plaintiff asserts it has put effort and expense into promoting its tiles using the chosen trade dress.  Id, Ex E at no 16; Ex H at 108:5-18, 108:22-113:13.  This includes advertisements in magazines, newspapers and trade publications and appearances at trade shows.  Id.  From January 2000 to the filing of the complaint, plaintiff invested over $8 million in this activity.  Id at Ex A.  Plaintiff applied for copyright registration on several of its designs, and on February 11, 2004, it received copyright registration for its "Avignon Romanesque Molding" and "Avignon Triellage Molding" designs.  Id ¶13 & Ex B (copyright registrations).

Plaintiff believes that defendant has been producing, promoting and selling tiles with designs and displays that are confusingly similar to plaintiff's.  Doc #1 at ¶16.  Plaintiff further believes that defendant is in the practice of copying the tile designs of its competitors and offering them as its own, assertedly an unfair method of competition.  Id ¶17.  In this case, the designs allegedly appropriated by defendant include the "Fleur De Lis Border," "Perle Molding," "Triellage Molding" and "Romanesque Molding" tiles from the Avignon line, and the "Westport Molding" tile from the Newport line.  Id ¶18.  Plaintiff believes not only that defendant has copied these tiles, but also that defendant has displayed the copies using trade dress similar to that used by plaintiff in promoting its corresponding tiles.  Id

¶19.

Along with this, plaintiff believes that defendant has made confusing or misleading statements about the relationship between plaintiff's and defendant's tiles.  Id ¶20.  For example, plaintiff alleges that defendant's representatives have stated that "[defendant's] tiles are the same as [plaintiff's] tiles, but at a much less expensive price."  Id.  Plaintiff also believes that defendant's representatives have claimed that both plaintiff's and defendant's tiles are made in China, when in fact plaintiff's tiles are not.  Id.

After the court dismissed plaintiff's defamation claim pursuant to defendant's Rule 12(b)(6) motion, Doc #26, six claims for relief remain.  Plaintiff alleges that:  (1) defendant has violated section 43(a) of the Lanham Act through unfair competition and false advertising by misappropriating plaintiff's trade dress and making false claims about plaintiff's products; (2) defendant has violated section 43(a) of the Lanham Act by infringing plaintiff's trade dress and thereby confusing consumers as to the origin of defendant's goods; (3) defendant has violated section 43(a) of the Lanham Act by falsely claiming that plaintiff's and defendant's goods have the same origin; (4) defendant has infringed plaintiff's copyrights in its tiles; (5) defendant's conduct violates the California unfair competition law, Cal Bus & Prof Code § 17200; and (6) defendant has engaged in false advertising under California statutory and common law.  Defendant seeks summary judgment on all counts.

//

//

4

United States District Court

For the Northern District of California

## II

In reviewing a summary judgment motion, the court must determine whether genuine issues of material fact exist, resolving any doubt in favor of the party opposing the motion. "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v Liberty Lobby, 477 US 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Id. And the burden of establishing the absence of a genuine issue of material fact lies with the moving party. Celotex Corp v Catrett, 477 US 317, 322-23 (1986). When the moving party has the burden of proof on an issue, the party's showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party. Calderone v United States, 799 F2d 254, 258-59 (6th Cir 1986). Summary judgment is granted only if the moving party is entitled to judgment as a matter of law. FRCP 56(c).

The nonmoving party may not simply rely on the pleadings, however, but must produce significant probative evidence supporting its claim that a genuine issue of material fact exists. TW Elec Serv v Pacific Elec Contractors Ass'n, 809 F2d 626, 630 (9th Cir 1987). The evidence presented by the nonmoving party "is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson, 477 US at 255. "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id

at 249.

<div style="text-align: center; font-weight: bold;">III</div>

<div style="text-align: center; font-weight: bold;">A</div>

Section 43(a) of the Lanham Act gives a producer a cause of action for the use by any person of "any word, term, name, symbol, or device, or any combination thereof * * * which * * * is likely to cause confusion * * * as to origin, sponsorship, or approval of his or her goods." 15 USC § 1125(a).  This cause of action has been extended to cover a product's "trade dress" — a category that traditionally consisted of packaging, but in modern parlance includes the design and shape of the product itself.  See Vision Sports, Inc v Melville Corp, 888 F2d 609, 613 (9th Cir 1989) (noting that trade dress includes "features such as size, shape, color, color combinations, texture or graphics.").  A claim for infringement of trade dress requires a plaintiff to prove three elements:  (1) distinctiveness, (2) non-functionality and (3) likelihood of confusion.  Kendall-Jackson Winery Ltd v E & J Gallo Winery, 150 F3d 1042, 1046-47 (9th Cir 1998).

Courts exercise "particular caution" when extending protection to product designs because such claims present an acute risk of stifling competition.  Landscape Forms, Inc v Columbia Cascade Co, 113 F3d 373, 380 (2d Cir 1997).  "While most trademarks only create a monopoly in a word, a phrase or a symbol, granting trade dress protection to an ordinary product design * * * create[s] a monopoly in the goods themselves."  Yurman Design, Inc v PAJ, Inc, 262 F3d 101, 115 (2d Cir 2001).

//

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

As a preliminary matter, defendant challenges plaintiff's claim for trade dress on the ground that plaintiff fails to identify the claimed trade dress with particularity.  The leading case cited by defendant on the need to articulate trade dress with particularity is Yurman Design, Inc v PAJ, Inc, 262 F3d 101 (2d Cir 2001).  At issue in that case was plaintiff's line of jewelry, about which the Second Circuit noted:  "The overall impression conveyed by the Yurman designs that are alleged to embody Yurman's trade dress is a structural, almost industrial motif of twisted multi-strand cable, executed with a polished and elegant finish, and set off by gemstones."  Id at 114.  The Second Circuit rejected this "overall impression" theory of trade dress, concluding that Yurman "never identified the elements that make up its trade dress, * * * [and] this failure to articulate the dress required dismissal of the Lanham Act claim as a matter of law."  Id.

The basis for Yurman's holding is the rule that generic product designs are unprotectible even upon a showing of secondary meaning.  See Abercrombie & Fitch Stores, Inc v American Eagle Outfitters, Inc, 280 F3d 619 (6th Cir 2002) (recognizing that "generic product configurations," or "designs regarded by the public as the basic form of a particular item," should not be protectible even upon a showing of secondary meaning).  This court recognizes the difficulty of applying traditional definitions of "genericness" to product design features.  See, e g, AM General Corp v Daimler Chrysler Corp, 311 F3d 796, 828 (7th Cir 2002) ("The traditional method of measuring a mark's strength with a yardstick that runs from generic at one end to arbitrary and fanciful at the other is a clumsy method when measuring the strength of trade dress

**7**

**United States District Court**

For the Northern District of California

or product design"). But the rule against enforcing generic product features guards against the acquisition of broad trademark exclusivities that bear little relation to consumer confusion.

Cases addressing product design suggest that the term "genericness" covers three situations: (1) if the definition of a product design is overbroad or too generalized; (2) if a product design is the basic form of a type of product; or (3) if the product design is so common in the industry that it cannot be said to identify a particular source. <u>Jeffrey Milstein, Inc v Greger, Lawlor, Roth, Inc</u>, 58 F3d 27, 32 (2d Cir 1995); <u>Yurman</u>, 262 F3d at 115 (concluding that a "generic" product design may also be defined as one that "refer[s] to the genus of which the particular product is a species"); <u>Mana Prods, Inc v Columbia Cosmetics Mfg, Inc</u>, 65 F3d 1063 (2d Cir 1995). See also <u>Big Island Candies, Inc v The Cookie Corner</u>, 269 F Supp 2d 1236 (D Haw 2003).

In <u>Kendall-Jackson Winery, Ltd v E & J Gallo Winery</u>, 150 F3d 1042 (9th Cir 1998), the Ninth Circuit's approach to genericness in the context of a trademark dispute applies also to a trade dress claim. In <u>Kendall-Jackson</u>, the court held that grape-leaf designs had become generic emblems for wine because grape leaves are commonly used to decorate labels on wine bottles and because the grape leaf alone "has lost the power to differentiate brands." Id at 1049. Hence, the court defined genericness in terms of both commonness and generality.

Turning to the trade dress at issue here, the court notes that plaintiff's complaint alleges three categories of trade dress, covering the individual tiles, the Avignon tile line and the tile displays. The elements said to constitute plaintiff's protectible

trade dress for its individual tiles are as follows:

> [Plaintiff's] tiles are distinguished by their classical
> designs and careful craftsmanship, which give the tiles
> the look of Old World handiwork.  The tiles are further
> distinguished by the depth and dimensions of their
> design relief, i e, the range between the highest and
> lowest points of relief, as well as by the level of
> intricate detailing at all levels of the relief.  The
> tiles are further distinguished by [the] use of colors
> and glazes that enhance the appearance of Old World
> craftsmanship.  Plaintiff further invokes Old World
> craftsmanship through its unique approach to designing
> and marketing tiles, through which [plaintiff] creates
> collections of tiles designed with a particular theme in
> mind.

Doc #84 (Degenshein decl), Ex D, no 15.

Although not articulated in its complaint, plaintiff now sets forth elements for its Avignon line as well.  The Avignon line is said to combine elements of both geometric and botanical art with other design elements in order to convey a French provençal look and feel.  More specifically, the trade dress of the Avignon line includes the following:

> (1)  the rustic look of hand-shaped tiles;
> (2)  the specific designs, and combinations of designs,
>      selected by plaintiff to evoke certain styles of
>      French architecture or art;
> (3)  the use of certain glazing techniques to create
>      color tones to reflect their three-dimensional,
>      sculpted appearance;
> (4)  complex three-dimensional relief to give the tiles
>      an architectural character;
> (5)  a textured appearance that evokes the weathered
>      look of stone carving; and
> (6)  a palette of colors reminiscent of Provence.

Overend decl, Ex G (Becker), 18:7-25, 21:2-23:8, 62:13-14, 64:16-65:3, 108:12-109:3, 171:1-6.

Finally, plaintiff asserts trade dress protection over its tile displays.  It defines the trade dress for its displays as follows:

United States District Court
For the Northern District of California

> [Plaintiff] pioneered the use of three types of tile displays * * *.  In its built-in vignettes, [plaintiff] builds a full-size model of a portion of a home – a corner of a bathroom * * * or a wall of a kitchen, complete with fixtures — and uses that model to demonstrate how its tiles may be used in a real life setting.  [Plaintiff's] concept boards are a smaller-scale, portable version of the same idea * * *.  [Plaintiff's] library boards [demonstrate] the concept-oriented product lines that are unique to it [including] samples of the tiles that make up a particular product line.  [It] is decorated with complementary colors and designs, and includes a narrative describing the design concept of the particular line.

As set forth above, to determine whether plaintiff's product design is generic, the court assesses whether (1) the design's definition is overbroad or too generalized; (2) the design is the basic form of a type of product; or (3) the design is so common in the industry that it cannot be said to identify a particular source.  Again, the motivation for requiring strict definition is that "trade dress claims raise a potent risk that relief will impermissibly afford a level of 'protection that would hamper efforts to market competitive goods.'"  Yurman, 262 F3d at 114 (quoting Landscape Forms, 113 F3d at 380).  See also Wal-Mart Stores, Inc v Samara Bros, 529 US 205, 213 n12 (2000) ("Consumers should not be deprived of the benefits of competition with regard to the utilitarian and esthetic purposes that product design ordinarily serves.")

The court first finds that some of the elements of plaintiff's proposed trade dress are overbroad.  The court acknowledges that trade dress of "decorative or artistic" works may be harder to capture in words, and "may need descriptions more broadly framed."  Yurman, 262 F3d at 115.  But for some of the trade dress elements, plaintiff resorts to empty generalities in

10

**United States District Court**
For the Northern District of California

the face of more precise alternatives.  For instance, to describe the colors of the trade dress, plaintiff should list the actual colors rather than claim a "palette of colors reminiscent of Provence."  Or instead of defining the three-dimensional relief as "complex," plaintiff should provide the magnitude and angle of relief that render plaintiff's tiles distinctive.  Finally, some terms leave the boundary of plaintiff's trade dress rights unclear, such as the terms "rustic look," "weathered look," "architectural character" or even "Old World handiwork."  These terms fail to provide adequate notice to competitors in the decorative tile business regarding the breadth of plaintiff's exclusivity rights.

The court also notes that portions of plaintiff's trade dress definition constitute the basic form of tile design.  For examples, a three-dimensional tile design necessarily uses "design relief," stone tiles will usually retain the "look of stone carving" and many manufacturers seek the "the rustic look of hand-shaped tiles."

Finally, plaintiff's design is common in the industry. Plaintiff's own witnesses admit that at least eight competitors market and sell a French provençal tile line.  Doc #84, Ex I (Leiferman depo) at 38:3-12; Ex G (Reef depo) at 37:9-12; 38. Indeed, the very reason plaintiff's tiles evoke the "look of Old World handiwork" is because the tiles copy styles that craftsman have used for centuries.  Plaintiff's tile display design is similarly generic.  Despite representations to the contrary, plaintiff did not "pioneer" the marketing strategy of "build[ing] a full-size model" in order to "demonstrate how its tiles may be used in a real life."

11

**United States District Court**

For the Northern District of California

That defendant takes issue with the proposed trade dress elements should not come as a surprise to plaintiff.  Throughout this litigation, defendant has sought further details regarding the scope of plaintiff's claimed trade dress.  The deposition of plaintiff's Rule 30(b)(6) witness, who was produced specifically to testify regarding plaintiff's alleged trade dress elements, amounted to an exercise in evasion.  For example, in response to inquiries about "depth of relief," plaintiff's Rule 30(b)(6) witness remarked:  "[t]he thing that is most unique about the depth of relief and dimension of the design relief is that they are elements that are used in creating specific and unique designs."  Doc #84 (Degenshein decl), Ex B at 76:21-25.  When asked to describe the trade dress of plaintiff's Romanesque tile, plaintiff's witness replied:  "[w]hat it is about their tile * * * is the fact that this tiles is a part of a collection that is recognized to be plaintiff's product."  Id at 38: 22-25.

Based on the evidence submitted by the parties, the court concludes that the trade dress proposed by plaintiff is generic. The concept of trade dress is not so pliable that it can be stretched to give exclusive rights to such abstract images or marketing themes as those proposed by plaintiff here.  See Landscape Forms, 113 F3d at 381 ("If the law protected style at such a level of abstraction, Braque might have prevented Picasso from selling cubist paintings in the United States.").

Having found plaintiff's trade dress to be generic, the court must determine the appropriate remedy.  Courts occasionally permit a trade dress plaintiff to offer an updated formulation of the trade dress elements at a later stage in the litigation.  See

United States District Court
For the Northern District of California

Coach, Inc v We Care Trading Co, Inc, 2001 US Dist LEXIS 9879 (SDNY 2001) ("Coach had provided varying formulations of this trade dress in its pre-trial papers but offered this definition at the pre-trial conference when asked by the court for a final statement of its trade dress.").  Yet the court has not found a case permitting such revisions after a motion for summary judgment has been filed.  This absence of case law is not surprising; it would be inappropriate to allow plaintiff to attempt to remedy a legal deficiency in the trade dress articulation after defendant's principal summary judgment briefing, especially in view of plaintiff's apparent efforts to resist offering a precise definition.  Moreover, because the court concludes, as explained below, that defendant is entitled to summary judgment on other grounds as well, the court declines to grant plaintiff leave to revise its trade dress elements.

1

Trade dress protection extends only to design features that are nonfunctional.  See Qualitex Co v Jacobson Prods Co, 514 US 159, 164 (1995).  Courts consider a feature functional if it is "essential to the use or purpose of the article [or] affects [its] cost or quality."  Inwood Labs, Inc v Ives Labs, Inc, 456 US 844, 851 n10 (1982).  This definition is often referred to as "utilitarian" functionality, as it relates to the performance of the product in its intended purpose.  Hence, "[t]he functionality doctrine prevents trademark law, which seeks to promote competition by protecting a firm's reputation, from instead inhibiting legitimate competition by allowing a producer to control a useful

13

product feature." Qualitex, 514 US at 164. See also TraFix Devices, Inc v Marketing Displays, Inc, 532 US 23 (2001).

Under Qualitex and TrafFix, the test for functionality proceeds in two steps. First, courts inquire whether the alleged "significant non-trademark function" is "essential to the use or purpose of the article or if it affects the cost or quality of the article." TrafFix, 532 US at 32-33. Next, courts determine whether protection of the feature as a trademark would impose a significant non-reputation-related competitive disadvantage. Id. See also Qualitex, 514 US at 165. If the feature does not satisfy either step, it is nonfunctional and protectible.

To assist courts in determining functionality, the Ninth Circuit has offered a four-part test: (1) whether the design yields a utilitarian advantage; (2) whether alternative designs are available; (3) whether advertising touts the utilitarian advantage of the design; and (4) whether the particular design results from a comparatively simple or inexpensive method of manufacture. Disc Golf Ass'n, Inc v Champion Discs, Inc, 158 F3d 1002, 1006 (9th Cir 1998). See also Talking Rain Beverage Co v South Beach Beverage Co, 349 F3d 601, 603-04 (9th Cir 2003) (applying the four factors to conclude that a bottle design was utilitarian).

Defendant contends the tile designs yield utilitarian advantages due to their aesthetic functionality. In response, plaintiff insists the Ninth Circuit has "expressly rejected the 'aesthetic functionality' standard." Doc #104 at 16. Yet neither party correctly characterizes the status of the aesthetic functionality standard, which, according to a recent Ninth Circuit decision, "retains some limited vitality." Au-Tomotive Gold, Inc v

14

United States District Court
For the Northern District of California

*Volkswagen of Am, Inc*, 457 F3d 1062 (9th Cir 2006).  In practice, aesthetic functionality has been limited to product features that serve an aesthetic purpose wholly independent of any source-identifying function.  See *Qualitex*, 514 US at 166 (coloring dry cleaning pads served non-trademark purpose by avoiding visible stains); *Publications Int'l, Ltd v Landoll, Inc*, 164 F3d 337, 342 (7th Cir 1998) (coloring edges of cookbook pages served non-trademark purpose by avoiding color "bleeding" between pages); *Brunswick Corp v British Seagull Ltd*, 35 F3d 1527, 1532 (Fed Cir 1994) (color black served non-trademark purpose by reducing the apparent size of outboard boat engine).

As the Ninth Circuit admits, its case law on aesthetic functionality "do[es] not easily weave together to produce a coherent jurisprudence." *Au-Tomotive Gold*, 457 F3d at 1068.  On the one hand, plaintiff's tiles serve an aesthetic function unrelated to source-identification:  namely, their function is decoration.  But on the other hand, the functionality doctrine apparently distinguishes between "ornamental" and utilitarian functions.  See *Talking Rain Beverage Co*, 349 F3d at 603-04 (9th Cir 2003) (applying this distinction between functional and ornamental); *Clicks Billiards, Inc v Sixshooters Inc*, 251 F3d 1252, 1260 (9th Cir 2001) (characterizing "aesthetic functionality" as an "oxymoron").  Hence, the Ninth Circuit's view that ornament is non-utilitarian obliges the court to conclude that plaintiff's tiles do not yield a utilitarian advantage, notwithstanding their decorative function.

That the tile's aesthetic appeal cannot constitute a utilitarian benefit undermines defendant's remaining contentions

United States District Court

For the Northern District of California

regarding functionality.  Defendant alleges that plaintiff "touts the trade dress' utilitarian advantages."  Doc #82 at 14.  But these advertisements describe the aesthetic beauty of the tiles, not the functional utility.

Because plaintiff's tile design is not essential to the use or purpose of the product, the court turns to the second inquiry:  whether plaintiff's design performs a function so that the "exclusive use of [the design] would put competitors at a significant non-reputation-related disadvantage."  TrafFix, 532 US at 32 (quoting Qualitex, 532 US at 165).  The parties do not discuss this issue, but it appears to pose factual questions that cannot be resolved at this stage in the litigation.  Plaintiff asserts in its brief that other manufacturers sell tiles and tile collections with a French provençal theme, implying that competition is not disadvantaged.  But more extensive market data would be necessary to demonstrate the absence of significant competitive disadvantage.

In sum, plaintiff's design features constitute ornamental attributes of the product; therefore, the court concludes these features are nonfunctional.

2

In an action for infringement of unregistered trade dress under § 43(a) of the Lanham Act, "a product's design is distinctive, and therefore protectible, only upon a showing of secondary meaning."  Wal-Mart Stores, 529 US at 216.  Such meaning occurs when, "in the minds of the public, the primary significance of a [mark] is to identify the source of the product rather than

16

the product itself." Id at 211 (quoting <u>Inwood Labs, Inc v Ives Labs, Inc</u>, 456 US 844, 851 n11 (1982)). See also <u>TraFix</u>, 532 US at 29 (2001) (noting that "product design almost invariably serves purposes other than source identification").

In the Ninth Circuit, secondary meaning is defined as "the mental association by a substantial segment of consumers and potential consumers between the alleged mark and a single source of the product." <u>Levi Strauss & Co v Blue Bell, Inc</u>, 778 F2d 1352, 1354 (9th Cir 1985) (quoting in part 1 J McCarthy, §§ 15:2 at 659 and 15:11(B) at 686)). An expert survey of purchasers typically provides the most persuasive evidence of secondary meaning. <u>Levi Strauss & Co v Blue Bell, Inc</u>, 778 F2d 1352, 1358 (9th Cir 1985) (en banc).

Here, plaintiff's survey performed by Dr Henry Ostberg found that 36% of interior designers in the six states where the parties compete, and 25% of interior designers interviewed nationwide, recognized either all or some of plaintiff's tiles as being produced by a specific company known to them. Overlend decl, Ex K at 3. Defendant criticizes Dr Ostberg for utilizing an underinclusive test group; that is, the survey sampled interior designers, yet plaintiff's customers include builders, design centers, architects, contractors and end users (i e, home owners or purchasers and retail customers). Doc #84, Ex A (Petrocelli depo) at 91:15-25, Ex I (Leiferman depo) at 100: 2-25; 101:9-15; Ex M (Wright depo) at 8:23-25; 9:1-2. See also <u>Vision Sports, Inc v Melville Corp</u>, 888 F2d 609, 615 (9th Cir 1989) (noting that "an expert survey of *purchasers* may provide the most persuasive evidence of secondary meaning") (emphasis added).

17

The court agrees with defendant that the limited survey population reduces its probative value, but the court declines to rule the survey inadmissible, Doc #87.  See J T McCarthy, McCarthy on Trademarks and Unfair Competition, (4th Ed 2003) § 32:159 ("A survey of the wrong 'universe' will be of little probative value in litigation.").  To assess secondary meaning, the courts "must stand in the shoes of the *ordinary purchaser*, buying under the normally prevalent conditions of the market and giving the attention such purchasers usually give in buying that class of goods." Iowa Paint Mfg Co, Inc v Hirshfield's Paint Mfg, Inc, 296 F Supp 2d 983, 998 (SD IA 2003) (emphasis added).  Yet even plaintiff's Rule 30(b)(6) witness concedes that interior designers are not "retail" or "average" customers, as they hold specialized knowledge of the tile industry.  Doc #84, Ex B (Becker depo) at 136:12-18; 141:20-25; 142:1-9.  See also, Id, Ex F (Reed depo) at 33:2-6.  Due to these shortcomings, the court assumes that, if the survey had included a proportionate sampling of all customers, the percentage of respondents identifying the tile design would be lower.  See Yankee Candle, 259 F3d at n14 (noting that opinions of retailers and those active in the field not evidence of views of the consuming public).  Indeed, plaintiff's survey undercuts its argument for secondary meaning:  the survey suggests that over three quarters of the most sophisticated purchasers do *not* recognize plaintiff's tiles as being produced by a specific company.

In view of plaintiff's unconvincing direct evidence, the court turns to circumstantial evidence, which includes:  (1) the length and exclusivity of use of the trade dress; (2) the nature and extent of advertising and promotion of the trade dress (3) the

existence of substantial advertising; (4) the product's established place in the market; (5) proof of intentional copying; and (6) "look for" promotion that specifically directs a consumer's attention to those features claimed as trade dress.  <u>Yankee Candle</u>, 259 F3d at 43-44.

The Ninth Circuit's decision in <u>First Brands Corp v Fred Meyer, Inc</u>, 809 F2d 1378 (9th Cir 1987) governs whether advertising expenditures support a finding of secondary meaning:

> Evidence of sales, advertising and promotional activities may be relevant in determining whether a trade dress has acquired a secondary meaning * * *. However, the advertising and promotional activities must involve "image advertising," that is, the ads must feature in some way the trade dress itself.  Otherwise, even evidence of extensive advertising or other promotional efforts would not necessarily indicate that prospective buyers would associate the trade dress with a particular source.  A large expenditure of money does not in itself create legally protectable rights.  The test of secondary meaning is the effectiveness of the effort to create it.

Id at 1383 (internal citations omitted).  The plaintiff in <u>First Brands</u> sought to establish secondary meaning for its yellow antifreeze container by introducing evidence of its total advertising expenditures and its five-year, exclusive use of the container.  Id.  The Ninth Circuit affirmed the district court's denial of injunctive relief, noting that plaintiff's advertising, although extensive, did not "attempt to engender consumer identification with the yellow, F-style jug" and "did not, for example, urge consumers to look for the 'familiar yellow jug.'" Id.

Akin to the plaintiff in <u>First Bank</u>, the plaintiff here submits advertising that emphasizes design product traits, but

19

United States District Court

For the Northern District of California

fails to draw attention to these features as source identifiers. See Yankee Candle, 259 F3d at 44. Plaintiff concedes it has not used so-called "look for" advertising, but urges the court to infer secondary meaning from the magnitude of plaintiff's advertising expenditures, which amounts to approximately eight million dollars. The court rejects plaintiff's reasoning. To be probative of secondary meaning, the advertising must direct the consumer to those features claimed as trade dress; merely "featuring" the relevant aspect of the product does not suffice. To provide protection based on extensive advertising would extend trade dress protection to the design of every product with national marketing. Accordingly, plaintiff's advertising expenditures do not constitute circumstantial evidence in support of secondary meaning.

Plaintiff also asks the court to infer secondary meaning from plaintiff's exclusive use of its design between 1999 and 2004, the period between product introduction and the date defendant commenced its alleged infringement. Whether secondary meaning attaches after a period of exclusive use depends on how, rather than how long, the plaintiff used its mark or design. See McCarthy § 15:53 at 15-77 (noting that length of time "is merely one additional piece of evidence to be weighed with all others in determining the existence of secondary meaning."). Widespread promotional activities enable a design to obtain secondary meaning in a short period. See, e g, LA Gear, Inc v Thom McAn Shoe Co, 988 F2d 1117, 1130 (Fed Cir 1993) (secondary meaning achieved for sports shoe design after only six months due to extensive advertising and promotion). But a lack of evidence supporting the other factors relevant to secondary meaning may diminish the

United States District Court
For the Northern District of California

probative value of even a long period of exclusive use.  See <u>Bank of Texas v Commerce Southwest, Inc</u>, 741 F2d 785, 788 (5th Cir 1984) (no secondary meaning for "Bank of Texas" mark despite nine years of exclusive use because plaintiff did not promote its mark outside narrow geographic area)

Here, plaintiff's five-year period of exclusive use provided ample time for its design to obtain secondary meaning. But secondary meaning cannot emerge in a vacuum, and the undisputed evidence detailed earlier confirms that plaintiff undertook little effort to create secondary meaning during this period of exclusive use.  Despite a considerable amount of advertising, only a trivial amount highlights the particular trade dress as source identifying.

Finally, plaintiff proffers evidence of defendant's copying to support an inference of secondary meaning.  See <u>Vision Sports, Inc v Melville Corp</u>, 888 F2d 609, 615 (9th Cir 1989).  See also <u>Transgo, Inc, v Ajac Transmission Parts Corp</u>, 768 F2d 1001 (9th Cir 1985) (citing <u>Audio Fidelity, Inc, v High Fidelity Recordings, Inc</u>, 283 F2d 551, 557 (9th Cir 1960)).  Prior to the litigation, defendant allegedly admitted it took plaintiff's tiles to China to have them copied.  Overend decl, Ex I (Reed) at 56:13-57:9-12, 79:23-80:10.  Further, the court agrees with plaintiff that the similarity between the tiles is striking.  See Id, Ex Q.

Proof of deliberate copying is not determinative, however, as it does not necessarily establish that the copying is intended to confuse customers and capitalize on recognition of the plaintiff's product.  See <u>Fuddruckers, Inc v Doc's B R Others, Inc</u>, 826 F2d 837, 844-45 (9th Cir 1987).  Competitors may intentionally copy product features for a variety of reasons; they may, for

example, choose to copy design traits in response to consumer preference.  Given the lack of direct and circumstantial evidence supporting secondary meaning, the court concludes that defendant's copying does not suffice.  The court thus concludes that plaintiff's trade dress is unprotectible because its tiles have not acquired secondary meaning.  Accordingly, the court GRANTS summary judgment on plaintiff's trade dress claims under the Lanham Act.

B

Defendant moves for summary judgment on plaintiff's false advertising claim, asserting that "[p]laintiff has not produced any evidence to support any one of [the claim's] elements."  Doc #82 at 22.

To state a claim for false advertising under § 43(a)(1)(B), a plaintiff must allege:

> (1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by a lessening of the goodwill associated with its products.

Southland Sod Farms v Stover Seed Co, 108 F3d 1134, 1139 (9th Cir 1997) (citing Cook, Perkiss and Liehe, Inc v Northern Cal Collection Serv, Inc, 911 F2d 242, 244 (9th Cir 1990)) (footnote omitted).

//

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

In the court's order on defendant's motion to dismiss, the court warned plaintiff that its complaint was "weak in the first element in particular, because it is light on allegations specific to defendant's 'commercial advertising,' as opposed to the 'statements' it generally attributes to defendant."  Doc #26 at 15-16.  For the following reasons, plaintiff has failed to remedy this weakness.

Representations constitute commercial advertising or promotion under the Lanham Act if they are: (1) commercial speech; (2) by a defendant who is in commercial competition with plaintiff; (3) for the purpose of influencing consumers to buy defendant's goods or services.  Coastal Abstract Serv v First Am Title Ins Co, 173 F3d 725, 735 (9th Cir 1999).  Further, although the representations need not be made in a "classic advertising campaign," they must be "disseminated sufficiently to the relevant purchasing public to constitute 'advertising' or 'promotion' within that industry."  Id.

The alleged false statements at issue here fall into two categories; neither satisfies the test set forth above.  First, the alleged statements to customers are not "disseminated sufficiently to the relevant purchasing public."  See Coastal Abstract Serv, 173 F3d at 735.  Although plaintiff portrays defendant's dissemination as widespread, see Doc #104 at 24 (defendant "repeatedly tell[s] customers that the parties' tiles are the same"), the deposition testimony fails to substantiate such a claim.  See Overend decl, Ex L at 104:24-106:14.  Additionally, plaintiff cites defendant's admission that it "has stated to at least one third party that [defendant's] and [plaintiff's] tiles product [sic] are both made

23

in China."  Overend decl, Ex Z.  This admission does not
demonstrate sufficient dissemination.  A handful of statements to
customers does not trigger protection from the Lanham Act unless
"the potential purchasers in the market are relatively limited in
number," Coastal Abstract Serv, Inc v First Am Title Ins Co, 173
F3d 725 (9th Cir 1999), which is not the case here.

Plaintiff's second category of false advertising consists
of defendant's promotion of "its Bellissimia tile line through its
catalog" and use of "confusingly similar display boards."  Doc #104
at 24.  The Lanham Act encompasses "more than blatant falsehoods";
it also embraces "innuendo, indirect intimations, and ambiguous
suggestions evidenced by the consuming public's misapprehension of
the hard facts underlying an advertisement."  William Morris Co v
Group W, Inc, 66 F3d 255 (9th Cir 1995).  But if an advertisement
is not false on its face, as here, plaintiff must produce evidence,
usually in the form of market research or consumer surveys, showing
exactly what message ordinary consumers perceived.  See Merck
Consumer Pharmaceuticals Co v Smithkline Beecham Corp, 960 F2d 294
(2d Cir 1992); Johnson & Johnson v Smithkline Beecham Corp, 960 F2d
294, 297-98 (2d Cir 1992) (requiring plaintiff to demonstrate that
"a statistically significant part of the commercial audience holds
the false belief allegedly communicated by the challenged
advertisement"); J T, McCarthy, McCarthy on Trademarks and Unfair
Competition, § 27-07[2][d] (4th ed 1992).

Because defendant's advertisements are not false on their
face, plaintiff alleges that the mere subject matter of the
advertisement — defendant's similar tiles — is enough to constitute
false advertising.  Under this interpretation of section 43(a),

trade dress violations would ipso facto constitute false advertising.  Plaintiff has not identified, and the court has not found, a case in which the truthful promotion of a product whose design violates another's trade dress has given rise to a false advertising claim.  Accordingly, the court GRANTS summary judgment on plaintiff's claim for false advertising.

C

In the Ninth Circuit, claims of unfair competition and false advertising under state statutory and common law are "substantially congruent" to claims made under the Lanham Act. Cleary v News Corp, 30 F3d 1255 (9th Cir 1994).  Accordingly, for reasons discussed *supra*, the court GRANTS summary judgment on plaintiff's claim for unfair competition pursuant to California Business and Professions Code § 17200 and GRANTS summary judgment on plaintiff's claim for false advertising.

D

Defendant contends plaintiff's copyright infringement claim fails because plaintiff's tile designs are not original.  For reasons that follow, the court GRANTS IN PART and DENIES IN PART summary judgment on plaintiff's claim for copyright infringement.

To prevail on a claim for copyright infringement, plaintiff must ultimately prove both ownership of a valid copyright and copying of protected expression by defendant.  Feist Publications v Rural Telephone Service Co, 499 US 361-63 (1991) Copying may be inferred from (1) access to the copyrighted work by defendant and (2) substantial similarity of both ideas and

expression between the copyrighted work and the allegedly infringing work.  Data East USA, Inc v Epyx, Inc, 862 F2d 204, 206 (9th Cir 1988).

Any copyrighted expression must be "original."  Feist, 499 US at 345.  Although the amount of creative input by the author required to meet the originality standard is low, it is not negligible.  See Feist, 499 US at 362.  There must be something more than a "merely trivial" variation, something recognizably the artist's own.  Three Boys Music Corp v Bolton, 212 F3d 477, 489 (9th Cir 2000).  A combination of unprotectible elements, however, may qualify for copyright protection.  Apple Computer, Inc v Microsoft Corp, 35 F3d 1435, 1446 (9th Cir 1994); United States v Hamilton, 583 F2d 448, 451 (9th Cir 1978) (Kennedy, J) ("[O]riginality may be found in taking the commonplace and making it into a new combination or arrangement.").

As a preliminary matter, the court addresses the parties' dispute over the effect of plaintiff's copyright registration.  It is undisputed that on February 11, 2004, the United States Copyright Office issued certificates of copyright registration to plaintiff for its "Avignon Romanesque Molding" and "Avignon Triellage Moding" designs.  Doc #1, Ex B (copyright registrations). "[T]he certificate of a registration made before or within five years after first publication of the work * * * constitute[s] prima facie evidence of the validity of the copyright and of the facts stated in the certificate."  17 USC § 410(c).  But see North Coast Industries v Jason Maxwell, Inc, 972 F2d 1031, 1033 (9th Cir 1992) (misquoting § 410(c) as requiring a plaintiff to commence an infringement suit "within five years after the copyright's first

United States District Court
For the Northern District of California

publication"); <u>Lamps Plus, Inc v Seattle Lighting Fixture Co</u>, 345 F3d 1140 (9th Cir 2003) (same).  A certificate of copyright registration, therefore, "shifts to the defendant the burden to prove the invalidity of the plaintiff's copyrights."  <u>Masquerade Novelty v Unique Indus</u>, 912 F2d 663, 668 (3d Cir 1990).  An accused infringer may rebut this presumption of validity, however.  See, e g, <u>North Coast</u>, 972 F2d at 1033.  To do so, a defendant must offer some evidence or proof to dispute or deny the plaintiff's prima facie case of infringement.  See, e g, <u>North Coast</u>, 972 F2d at 1033.

Defendant, through its expert, Travis Culwell, presents to the court various historical sources that raise serious questions whether plaintiff's tiles are sufficiently "original" to merit copyright protection.  In particular, these materials reveal that plaintiff's tiles are nearly identical in appearance to public domain designs.  This evidence suffices to show that plaintiff's tiles are "not original but copied from another's work"; therefore, the court finds that defendant has rebutted the statutory presumption, and the burden of proving validity shifts back to plaintiff.  See <u>North Coast</u>, 972 F2d at 1033; see also <u>Masquerade Novelty</u>, 912 F2d at 668-69; <u>Durham</u>, 630 F2d at 908-09 (holding that the presumption of validity was rebutted where "one look" at the plaintiff's allegedly copyrightable figures revealed an absence of originality).  See also 4 Melville B Nimmer & David Nimmer, <u>Nimmer on Copyright</u> § 12(11)[B] n50 (1999) (noting "proof that the plaintiff copied from prior works should involve the same elements * * * as are required to establish copying by the defendant from the plaintiff, i e, access and similarity.").

United States District Court
For the Northern District of California

Having dealt with the registration issue, the court next evaluates whether plaintiff's tiles are copyrightable. That plaintiff's tiles derive from public domain designs does not necessarily deprive them of copyright protection. See Kamar, Int'l, Inc v Russ Berrie & Co, 657 F2d 1059, 1061 (9th Cir 1981). Nevertheless, the copyright protection afforded to works derived from the public domain is more limited than it is for original works of authorship.

The court finds that differences exist between the designs in the public domain and those in plaintiff's tiles; hence, the critical issue is whether the differences are non-trivial. Not every modification of a work in the public domain is protectibile. For example, copyright law protects "expressions" and not "ideas"; consequently, the concepts underlying an expression, however ingenious, may be copied freely. Likewise, the copyright on a work whose design reflects the artist's original advance in technique does not extend to the technical development itself. See 17 USC § 102(b) ("In no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work."). Finally, even original expression goes unprotected insofar as it is "necessary" to something unprotectible like an idea or a method or process. The expression is then said to merge with the unprotected attribute, and the merger deprives it of protection. See Computer Assocs Int'l, Inc v Altai, Inc, 982 F2d 693, 707 (2d Cir 1992)

//

United States District Court

For the Northern District of California

Upon review of defendant's expert report, the court concludes that the Westport and Perle molding designs do not evince sufficient originality for copyright protection.  See Nimmer on Copyright § 2-08(C)(2)(noting that "mere production of a work of art in a different medium should not constitute the required originality, for the reason that no one can claim to have independently evolved any particular medium").  See also North Coast, 972 F2d at 1034 (stating that summary judgment is appropriate "where no reasonable trier-of-fact could find even trivial differences in the designs" that were claimed to be copyrightable).  By contrast, the Romanesque, Treillage and Fleur de Lis molding designs contain non-trivial differences from the public domain designs.  In the Romanesque molding design, for example, plaintiff appears to have made some copyrightable contributions, such as the curls in the leaf, the orientation of the blades and the shape of the veins.  To the extent that these and other artistic choices were not copied from the public domain or governed by the ceramic tile medium, they are original elements that plaintiff may protect through copyright law.

The court notes that plaintiff's copyrights on the original elements in the Romanesque, Treillage and Fleur de Lis designs are "thin," comprising no more than plaintiff's original contribution to ideas already in the public domain.  As a result, plaintiff's copyrights only protect against virtually identical copying.  See Ets-Hokin, 323 F3d 763, 766 (9th Cir 2003) ("When we apply the limiting doctrines, subtracting the unoriginal elements, Ets-Hokin is left with * * * a 'thin' copyright, which protects against only virtually identical copying."); Apple, 35 F3d at 1439

**United States District Court**
For the Northern District of California

("When the range of protectible expression is narrow, the appropriate standard for illicit copying is virtual identity.").

Accordingly, the court DENIES defendant's motion for summary judgment on plaintiff's claim for copyright infringement of the Romanesque, Treillage and Fleur de Lis molding designs and GRANTS summary judgment on claims for copyright infringement of the Westport and Perle molding designs.

## IV

In sum, the court DENIES IN PART and GRANTS IN PART defendant's motions for summary judgment and DENIES defendant's motion to strike the surveys conducted by plaintiff's expert, Dr Henry Ostberg.  The court also DENIES plaintiff's motion to exclude the testimony of defendant's expert, Travis Culwell.

IT IS SO ORDERED.

_____

VAUGHN R WALKER

United States District Chief Judge

30